UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

GLENDA M. MEJIA,

                                    Plaintiff,

              -against-

THE CITY OF NEW YORK; THE NEW YORK
CITY POLICE DEPARTMENT; THE
PATROLMEN'S BENEVOLENT ASSOCIATION
OF THE CITY OF NEW YORK; WILLIAM J.
BRATTON, individually and in his official
capacity; CAROL ANN ROBERSON,
individually and in her official capacity;
OFFICER STEVEN WALLACE, individually and
in his official capacity; SERGEANT PAUL
BERNAL, individually and in his official
capacity; and OFFICER MICHAEL
OPROMALLA, individually and in his official
capacity,

                                    Defendants.

**MEMORANDUM & ORDER**
**17-CV-2696 (NGG) (JO)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Glenda M. Mejia asserts a panoply of federal, state, and
city law claims against Defendants the City of New York (the
"City"), the New York City Police Department ("NYPD"), William
Joseph Bratton, Carol Ann Roberson, Officer Steven Wallace, Of-
ficer Michael Opromalla, and Sergeant Paul Bernal (collectively,
the "City Defendants"); and the Patrolmen's Benevolent Associa-
tion of the City of New York (the "PBA"). Specifically, Plaintiff
asserts claims for: (1) race discrimination and retaliation under
42 U.S.C. § 1981; (2) denial of due process as guaranteed by the
Fourteenth Amendment under 42 U.S.C. § 1983; (3) denial of
equal protection as guaranteed by the Fourteenth Amendment
on the basis of age, race, sex, and disability discrimination under
42 U.S.C. § 1983; (4) race, age, disability, sex, and hostile work

1

environment discrimination, as well as retaliation, under the New York State Human Rights Law ("NYSHRL"), codified at N.Y. Exec. Law § 296 *et seq.*; and (5) sex, race, and hostile work environment discrimination, as well as retaliation, interference with protected rights, supervisory liability, and aiding-and-abetting liability under the New York City Human Rights Law ("NYCHRL"), codified at N.Y.C. Admin Code § 8-107 *et seq.*

Now before the court are the City Defendants' and the PBA's respective motions for summary judgment. (*See* City Defs. Mot. for Summ. J. (Dkt. 77); Mem. in Supp. of City Defs. Mot. for Summ. J. ("City Mem.") (Dkt. 77-2); Mem. in Opp. to City Defs. Mot. for Summ. J. ("City Opp.") (Dkt. 84); Reply Mem. in Supp. of City Defs. Mot. for Summ. J. (Dkt. 85); PBA Mot. for Summ. J. (Dkt. 77); Mem. in Supp. of PBA Mot. for Summ. J. (Dkt. 77-2); Mem. in Opp. to PBA Mot. for Summ. J. (Dkt. 82); Reply in Supp. of PBA Mot. for Summ. J. (Dkt. 83).)

For the reasons that follow, Defendants' motions are GRANTED IN PART and DENIED IN PART. Specifically, the motions are granted as to all claims except for Plaintiff's NYCHRL hostile work environment claim against Opromalla and Wallace, over which the court exercises its discretion to retain jurisdiction.

## I.   STATEMENT OF FACTS

The court draws the following statement of facts from the parties' Rule 56.1 statements and the admissible evidence submitted therewith. The court construes the evidence in the light most favorable to Plaintiff and draws all reasonable inferences in her favor. *See, e.g., Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999) (collecting cases).[1] Where the facts are in dispute, the court credits Plaintiff's version of events

---

[1] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted and all alterations are adopted.

if it is supported by record evidence. *Id.* However, where Plaintiff fails to controvert properly supported factual statements with citations to admissible evidence, the court credits Defendants' version of events and deems such facts undisputed for the purpose of deciding this motion. *See, e.g.*, *Scott v. City of New York*, No. 16-cv-834 (NGG), 2020 WL 208915, at *1 (E.D.N.Y. Jan. 14, 2020).

### A. Background

Plaintiff began employment with the NYPD as a probationary police officer at the NYPD Academy on January 8, 2014. (City Defs. Reply to Pl. 56.1 Counterstatement ("City 56.1 Reply") (Dkt. 85-1) ¶¶ 1, 9; Pl. Resp. to City Defs. Local R. 56.1 Statement ("City 56.1 Resp.") (Dkt. 84-2) ¶ 1; *see also* Pl. Resp. to PBA Local R. 56.1 Statement ("PBA 56.1 Resp.") (Dkt. 79-1) ¶¶ 1-2.)[2] Plaintiff was born on January 2, 1981 and was 33 years old when she entered the Academy. (City 56.1 Reply ¶ 2.) Approximately 40% of Academy recruits are Hispanic and approximately 25% are women. (*Id.* ¶¶ 268-269.) Plaintiff was one of four women and one of two Hispanic individuals in her company of 27 recruits. (*Id.* ¶¶ 32, 34.) Plaintiff entered the Academy after completing a master's degree in criminal justice leadership. (*Id.* ¶ 4.)

As part of the requirements to enter the Academy, Plaintiff submitted to a background investigation, medical history investigation, psychological testing, and physical testing, including a physical exam by her primary care physician. (*Id.* ¶ 6.) At some

---

[2] The PBA submitted its own Rule 56.1 Statement, to which Plaintiff responded. Plaintiff also filed a counterstatement to the PBA's 56.1 Statement, which is identical to the counterstatement she filed in response to the City Defendants' 56.1 Statement. (*Compare* PBA 56.1 Resp. at pp. 12-49 *with* Pl. 56.1 Counterstatement in Opp. to City Mot. (Dkt. 84-1).) For simplicity's sake, unless a specific material fact is relevant only to the PBA's motion, the court will refer only to the 56.1 Statement, Response, Counterstatement, and Response to Counterstatement filed in connection with the City Defendants' motion.

point prior to entering the Academy, Plaintiff suffered a stress fracture to her left foot, which she did not disclose in her application materials. (City 56.1 Resp. ¶ 4; Tr. of Mar. 14, 2018 Dep. of Pl. ("Pl. Tr.") (Dkt. 77-6) at 40:4.) At the time that she entered the Academy, Plaintiff described her current physical fitness level as "poor" and noted that she "currently did not work out." (City 56.1 Resp. ¶ 3.)

To graduate from the Academy, probationary officers are required to demonstrate their ability to perform the duties of NYPD officers, which include running after fleeing suspects, climbing stairs, carrying an injured adult with assistance, and being physically active for prolonged periods of time. (City 56.1 Resp. ¶ 2.) As such, probationary officers must, among other things, complete a 1.5 mile run within fourteen minutes and twenty-one seconds, and recruits are warned that failure to do so will result in their termination from the NYPD. (*Id.* ¶ 5; Pl. Tracking Booklet ("Tracking Booklet") (Dkt. 84-20) at 5.) Plaintiff unsuccessfully attempted to complete the required 1.5 mile run on two occasions. (*Id.* at 9; *see also* City 56.1 Resp. ¶ 6.) On her first attempt, Plaintiff completed the run in approximately seventeen minutes; on her second attempt, Plaintiff completed the run in approximately nineteen minutes. (Tracking Booklet at 9.)[3]

As detailed below, Plaintiff was ultimately terminated from her position as a probationary police officer and did not graduate from the Academy. Plaintiff was one of 150 individuals who resigned or were terminated in 2014-2015. (City 56.1 Resp. ¶ 49.) That group of 150 comprised individuals who were white, black, Hispanic, and Asian. (*Id.* ¶ 48.) Further, of those 150, 90 were

---

[3] Plaintiff testified that, on her second attempt, she was still "injured" and "with pain" but that "[t]hey made [her] take the test," (Pl. Tr. at 85:4-7), although she has provided no evidence that she notified her instructors that she was in pain or that she did not feel able to take the test. It is likewise not clear from the record when she made her second attempt.

male and 72 were white. (*Id.* ¶ 49.) Two of the recruits who were terminated under the same disciplinary code as Plaintiff were white males. (*Id.* ¶ 50.)

### B. Plaintiff's Injuries and Alleged Disability Discrimination

Like other recruits, Plaintiff was required to train in the Academy's gym, where Opromalla and Bernal (who supervised Opromalla) were among her instructors. (City 56.1 Reply ¶¶ 13, 15-18.) One month after beginning at the Academy, on February 17, 2014, Plaintiff complained of shin splints due to running in the Academy and was seen by Dr. Peter Galvin, an NYPD physician. (Sept. 5, 2014 Memo. Recommending Termination (Dkt. 77-13 at ECF 12).) After examining Plaintiff, Dr. Galvin placed her on limited duty for one week. (*Id.*) Plaintiff returned to full duty on February 24, 2014. (*Id.*) Plaintiff testified that she had not experienced shin splints prior to entering the Academy, although she also testified that she had not run regularly prior to entering the Academy. (City 56.1 Reply ¶ 48.) While Plaintiff was on full duty, Plaintiff's gym instructors referred her to "voluntary training" and discussed "maintaining proper nutrition & upper body exercises that should not interfere with injury." (Tracking Booklet at 19.)

On Friday, March 7, 2014, Bernal observed Plaintiff in obvious pain and discomfort while running during training exercises. (City 56.1 Resp. ¶ 8.) Bernal logged the injury and directed Plaintiff to notify her instructors if her pain persisted during her next scheduled gym class on March 10, 2014. (*Id.* ¶ 9.) On Saturday, March 8, 2014, a non-NYPD physician diagnosed Plaintiff with a possible stress fracture and advised that she rest for at least one week and engage in only limited exercise, specifically "stationary biking for 45 minutes a day" and "heel raises, toe raises + squats three sets 15 reps." (Mar. 8, 2014 Discharge Instructions (Dkt. 84-48 at ECF 1); *see also* City 56.1 Resp. ¶ 10; City 56.1 Reply

¶¶ 59-60.) On Monday, March 10, 2014, Plaintiff was placed on limited duty at Bernal's recommendation. (City 56.1 Resp. ¶¶ 11-12.)

On March 17, 2014, Plaintiff was examined by NYPD physician Dr. Goldman[4] who diagnosed her with a possible stress fracture and recommended an MRI and bone scan. (Mar. 17, 2014 Referral (Dkt. 84-13 at ECF 19); *see also* 56.1 Reply ¶ 90.) Dr. Goldman further indicated that Plaintiff should remain on limited duty but noted that her prognosis was "good." (Mar. 17, 2014 Referral; 56.1 Reply ¶ 90.) On March 29, 2014, Plaintiff underwent an MRI. (*See* Med. Recs. Dated Mar. 29, 2014 (Dkt. 84-13 at ECF 17-18).) On April 2, 2014, Plaintiff underwent a bone scan that revealed a fracture in her tibia. (City 56.1 Reply ¶ 99.) On April 8, 2014, Plaintiff's personal physician, Dr. Leon Bernstein, signed a note stating that Plaintiff had suffered a stress fracture in her tibia and that she "is totally disabled from physical training." (*Id.* at ¶ 100.) At or around this time, Plaintiff alleges that Bernal told her: "You should change your dream because I think at this point you can't even handle this physical activity. You've already suffered an injury and I don't think you have what it takes. You're all brains, but no[t] physical[ly]" built to be a police officer. (Tr. of Apr. 11, 2016 Pl. 50-h Hg. ("50-h Tr.") (Dkt. 84-7) at 41:8-13.)

On May 1, 2014, NYPD orthopedist Dr. James Henry examined Plaintiff and observed no pain or swelling in her leg. (City 56.1 Resp. ¶¶ 18-20). Dr. Henry's notes of that examination reflect that Plaintiff stated that she "feel[s] great." (*Id.*) Dr. Henry thus returned Plaintiff to full duty. (City 56.1 Reply ¶¶ 107-108; May 1, 2014 Change of Duty Status (Dkt. 84-13 at ECF 10).) Plaintiff testified that, though she had returned to full duty status and was required to resume training, she continued to experience pain in

---

[4] The record does not provide Dr. Goldman's first name.

her leg. (City 56.1 Reply ¶¶ 112, 114.) There is no evidence in the record, however, to suggest that Plaintiff reported this pain to her supervisors, except that her log book reflects that on June 3, 2014, she was "evaluated by Dr. Galvin [and] ordered to report for full duty." (*Id.* ¶ 119.) Plaintiff also testified that she was bullied by unnamed individuals who made fun of her for her weight and the fact that she was limping due to her injuries. (Pl. Tr. at 32:24-33:5.)

On July 16, 2014, Plaintiff was examined by Dr. Igor Cohen, a neurologist unaffiliated with the NYPD, for pain in her lower back and right leg. (*Id.* ¶ 126.) Dr. Cohen recommended that Plaintiff have an MRI of her lumbar spine and an EMG (electromyography) of her lower extremities. (Med. Recs. Bates-stamped MEJIA 338-339 (Dkt. 84-22).) Dr. Cohen further recommended Plaintiff begin physical therapy, chiropractic treatment, and epidural injections. (*Id.*) Plaintiff testified that Dr. Cohen told her that he "wanted to start with exercises for [her] back. Nothing strenuous." (City 56.1 Reply ¶ 141.) The record reflects that Plaintiff began twice-weekly physical therapy on or around July 23, 2014 and that she responded well to the therapy. (*See, e.g.*, July 23, 2014 PT Rep. (Dkt. 84-21); Pl. Tr. at 50:18-51:3.) At or around this time, Plaintiff was "held over" at the Academy past her scheduled graduation date. (City 56.1 Reply ¶ 137.)

At some point in time not clear from the record, Plaintiff approached Wallace, who is a PBA Delegate and an NYPD HR counselor, and advised him that she intended to provide Dr. Galvin with documentation relating to her injury prior to becoming a police officer. (*Id.* ¶ 132; Tr. of Apr. 12, 2018 Dep. of S. Wallace ("Wallace Tr.") (Dkt. 84-11) at 76:20-24.) Wallace testified that he advised her not to give the materials to Dr. Galvin because doing so—and thereby disclosing a previously undisclosed injury—"could get her terminated." (Wallace Tr. at 77:13-15.)

Plaintiff underwent an EMG on July 30, 2014, which revealed an L5-S1 radiculopathy and evidence of nerve damage in her lower back. (City 56.1 Resp. ¶ 30.) On August 13, 2014, Plaintiff underwent an MRI, which showed that Plaintiff had "posterior bulging disks L5-S1." (City 56.1 Reply ¶ 154.) On August 25, 2014, Dr. Cohen administered an epidural injection of Dexamethasone and Lidocaine to Plaintiff. (*See* Aug. 25, 2019 Procedure Note (Dkt. 84-21 at ECF 9).)[5]

On September 3, 2014, Dr. Cohen examined Plaintiff and wrote a letter to the NYPD Medical Department indicating that, in his opinion, Plaintiff was "100% disable[d] and … unable to work until [her] next re-evaluation on October 1, 2014." (City 56.1 Reply ¶ 153.)

On September 5, 2014, Dr. Galvin examined Plaintiff and reviewed her MRI results. (*Id.* ¶ 160.) Dr. Galvin placed Plaintiff on restricted duty and referred her to Dr. Henry. (Sept. 5, 2014 Referral (Dkt. 84-13 at ECF 8).) Plaintiff testified that, at some point while she was experiencing back pain, she asked Dr. Galvin for an elevator pass and he responded "why? You look fine." (City 56.1 Reply ¶ 162.) It is not clear from the record when this request was made, although Plaintiff's 56.1 counterstatement asserts that it was at the September 5, 2014 meeting. (*Id.*) It is also unclear whether Plaintiff responded to Dr. Galvin's question. Further, Plaintiff testified that Dr. Cohen told her that she "could go up and down stairs" notwithstanding her condition. (Pl. Tr. 56:7.)

---

[5] On various dates in July, August, and early September 2014, Plaintiff participated in "voluntary tutoring" at the Academy, which consisted of supplemental exercises, including, on some occasions, running. (*E.g.*, 56.1 Reply ¶¶ 138-139, 144-152.) Although Plaintiff claims in her papers that she was "forced to submit" to these exercises, there is no evidence in the record to support this characterization.

According to Plaintiff, at this appointment, Dr. Galvin told Plaintiff that "[she] should resign." (City 56.1 Reply ¶ 161.) Relatedly, Plaintiff testified in a prior proceeding that around this time, NYPD Sgt. Honan (who worked in human resources and who is female) told Plaintiff that Dr. Galvin had suggested to her that Plaintiff should resign from the NYPD and that she believed Plaintiff should consider doing so because Plaintiff did "not have what it takes to be a police officer" and "[her] personality was too strong and [she] wouldn't know how to play the game in the police department." (50-h Tr. at 23:22-24:11.) Plaintiff testified that when she told Sgt. Honan that she would not resign, Sgt. Honan told her: "Listen. You have no rights as a recruit. You are not going to get another city job. If you get fired, you are not going to get another city job." (Pl. Tr. at 100:18-21; *see also* Aff. of G. Mejia (Dkt. 84-4) ¶ 13.)

Later on September 5, 2014, Dr. Henry examined Plaintiff and noted that her "current condition [was] not compatible with full duty training/police work;" that he agreed that she should remain on restricted duty; that she "may require definitive treatment, *i.e.*, surgery;" and that her prognosis was "guarded/poor." (City 56.1 Reply ¶ 166; Sept. 5, 2014 Rep. (Dkt. 84-13 at ECF 8).) Dr. Henry explained that, by "guarded" he meant that "there is a chance maybe she can have surgery. Back of my mind, I'm thinking maybe if she has surgery, she can come back from this." (Tr. of May 10, 2018 Dep. of J. Henry ("Henry Tr.") (Dkt. 84-9) at 36:16-20.) Although he stated that he would have referred her to a neurosurgeon if he were seeing her in private practice, he did not do so because he was not her treating physician. (*Id.* at 33:20-34:7.) Dr. Henry further noted that Plaintiff had been quoted as stating that training at the Academy was worsening her condition. (*Id.* at 26:22-24; *see also* NYPD Medical Division File at 8.) Dr. Henry testified at deposition that L5-S1 radiculopathy makes activities including running, climbing, stair climbing,

and ladder climbing more difficult, and in severe cases could result in tripping and difficulty walking in a condition known as drop foot. (City 56.1 Resp. ¶ 31.)

Later that day, Dr. Galvin recommended Plaintiff's medical separation from the NYPD. (Sept. 5, 2014 Memo. Recommending Termination.) Specifically, Dr. Galvin wrote: "[I]t is the opinion of the undersigned and Dr. Henry that [Plaintiff] has a chronic, non-[line-of-duty] medical condition that precludes full duty at present and in the foreseeable future. Due to this fact the undersigned and Dr. Henry recommend medical termination/separation of this [probationary police officer] from the NYPD." (*Id.*) However, despite Dr. Galvin's recommendation, Plaintiff was not terminated at this point.

In or around October 2014, Plaintiff provided the NYPD Medical Division with a letter from her personal physical therapist indicating she was undergoing physical therapy and "has a good prognosis and can do her usual activities as tolerated." (City 56.1 Reply ¶¶ 189-190; *see also* Letter from Leita Lappay (Dkt. 84-13 at ECF 15).)[6] On October 1, 2014, Dr. Cohen wrote another letter to the NYPD Medical Department stating that Plaintiff was "able to return to work with moderate partial disability" and that her "[o]verall prognosis for full recovery is good however, full determination will be done after 2nd epidural injection." (City 56.1 Reply ¶¶ 187, 191.) On October 20, Dr. Cohen wrote that Plaintiff "state[d] [that her] condition has significantly improved after 2nd epidural. She is to continue physical therapy and chiropractic once a week and is to return for a follow up appointment

---

[6] The court notes that this letter is undated and states that Plaintiff had "start[ed] her physical therapy last month." (Letter from Leita Lappay.) As set forth *supra*, Plaintiff began physical therapy on July 23, 2014. However, the letterhead on this particular letter indicates it is from a different clinic from that which produced the July 23, 2014 physical therapy record. (*Compare id. with* July 23, 2014 PT Rep.)

on November 17, 2014. Patient is still to work with moderate partial disability." (*Id.* ¶ 193.) On November 17, 2014, Dr. Cohen again noted that Plaintiff had stated that "her condition has significantly improved" and reiterated his prior recommendations. (*Id.* ¶ 194.)[7] On December 22, 2014, Dr. Cohen stated that Plaintiff could perform light duty until January 18, 2015 and resume full duty thereafter. (*Id.* ¶ 209.)

Plaintiff saw Dr. Galvin for a follow-up appointment on January 22, 2015, during which she presented him a letter from Dr. Cohen dated December 22, 2014 in which Dr. Cohen indicated that "[Plaintiff] will be able to return to work full time and duty after January 19th." (*Id.* ¶ 217; Dec. 22, 2014 Letter from I. Cohen (Dkt. 84-21 at ECF 1); Jan. 22, 2015 Referral (Dkt. 84-13 at ECF 5).) Dr. Galvin, however, did not return Plaintiff to full duty and instead referred her to Dr. Henry. (City 56.1 Reply ¶ 220; Jan. 22, 2015 Referral.)[8]

---

[7] On various dates in November, December, and January, Plaintiff exercised and trained at the Academy gym. (*E.g.*, *id.* ¶¶ 195-208, 213-215.) Plaintiff claims in her moving papers that she was "forced" to do so, but there is no evidence in the record to support this assertion.

[8] Plaintiff's 56.1 counterstatement asserts that Dr. Galvin made various comments at this meeting to the effect that Plaintiff should consider resigning, and that Plaintiff then went to speak with other NYPD employees about Dr. Galvin's comments. (City 56.1 Reply ¶¶ 219-222.) While the City Defendants agree with this attribution, the only evidence in the record to support these assertions, *i.e.*, Plaintiff's deposition testimony and log book, attributes these comments to Dr. Henry (whom Plaintiff saw a week later) and indicates that the additional conversations occurred after Plaintiff visited Dr. Henry. (*See* Pl. Tr. 105-107; *see also* PBA 56.1 Resp. ¶¶ 20-26 (indicating that conversation with Wallace occurred after appointment with Dr. Henry).) Moreover, Plaintiff's 56.1 counterstatement is inconsistent in that it seems to indicate that some conversations occurred twice, both after the meeting with Dr. Galvin and after the subsequent appointment with Dr. Henry, which is both implausible and unsupported by the record. (*See* 56.1 Reply ¶¶ 237, 240.) The court thus adheres to the version of events

Dr. Henry examined Plaintiff on January 29, 2015. (City 56.1 Reply ¶¶ 237-238; Jan. 29, 2015 Rep. (Dkt. 83-13 at ECF 5).) Dr. Henry's examination indicated that Plaintiff was asymptomatic, but he noted concern about her overall prognosis given her underlying condition. (Jan. 29, 2015 Rep.; Henry Tr. at 82:14-83:17.) After consulting with Dr. Miller, a senior NYPD orthopedist, Dr. Henry concluded that Plaintiff's condition was "not compatible with long-term police work" and that future problems were expected. (Jan. 29, 2015 Rep.; Henry Tr. at 83:17-23.) Dr. Miller agreed with Dr. Henry's conclusions. (Henry Tr. at 83:17-23.) When asked at his deposition about Dr. Cohen's assertion that Plaintiff would be ready to return to duty, Dr. Henry testified that "the vast majority of the doctors on the outside who have not worked in this capacity don't understand the level of physical training" required of probationary officers and that Plaintiff was "at risk for significant personal injury" were she to continue at the NYPD. (Henry Tr. at 85:4-9.) Plaintiff testified that, at this appointment, Dr. Henry told her that he "did not think [she] would make it too far" and advised her that she "should do some soul searching. Maybe being a police officer isn't for you. Maybe you should become a lawyer one day." (City 56.1 Reply ¶¶ 218-219; Pl. Tr. at 105:10-14, 105:25-106:7.) Plaintiff objected, in response to which Dr. Henry advised her that he would "discuss [it] with Lt. Valenti" and that she would remain on restricted duty. (City 56.1 Reply ¶ 239.) Plaintiff further testified that Dr. Henry scheduled a follow-up appointment with her for on or around February 24, 2015. (Pl. Tr. 106:5-7.)

After seeing Dr. Henry, Plaintiff reported to Sgts. Vera and Corrente at recruit operations. (City 56.1 Reply ¶ 221; Pl. Tr. 106:16-21.) Plaintiff testified that after explaining what Dr. Henry had

---

set forth in the record and admonishes counsel for Plaintiff and the City Defendants to pay closer attention when drafting and responding to 56.1 statements so as to not waste the court's time.

said to her, Sgt. Vera also encouraged her to resign. (Pl. Tr. at 106:16-24.)  Sgt. Vera then told Plaintiff to speak with Wallace, an HR counselor and PBA delegate. (*Id.*)[9]

Dr. Cohen examined Plaintiff on February 2, 2015. (City 56.1 Reply ¶ 241.) According to Dr. Cohen's report, as of that day Plaintiff reported that her condition had "markedly improved." (Feb. 2, 2015 Rep. (Dkt. 84-21 at ECF 6).) Dr. Cohen determined Plaintiff's "lower back syndrome" had resolved, and that her remaining conditions (herniated disc and radiculopathy) were asymptomatic. (*Id.*) Dr. Cohen concluded that Plaintiff should resume her usual activities and "will be able to return to full duty work … effective immediately." (*Id.*)

That same day, the NYPD terminated Plaintiff based on Dr. Galvin, Dr. Henry, and Dr. Miller's conclusion that her condition was incompatible with long-term police work. (City 56.1 Resp. ¶ 44-47.) Plaintiff was informed of her termination the following day. (City 56.1 Reply ¶ 245.) There is no evidence in the record to suggest that any of the individuals named as defendants in this proceeding had any input concerning the decision to terminate Plaintiff.

On August 24, 2015, Plaintiff began employment as a "Special Patrolman" at the Starrett City housing development, a position to which she was appointed by the NYPD. (PBA 56.1 Resp. ¶¶ 36-40.)

Plaintiff identified at least two other individuals whom she testified had similar injuries but that ultimately graduated from the Academy. (City 56.1 Resp. ¶¶ 34-35.)

### C.   Alleged Sex Discrimination

Plaintiff testified that she was subject to various unwanted comments and an alleged sexual advance during her time at the

---

[9] Plaintiff's conversation with Wallace is detailed in Section I.C.

Academy. During her first months there, Plaintiff testified that her company instructor, Officer Russell, told her: "You are very attractive. You are not going to have a problem in the precinct. You could be driving a sergeant around." (City 56.1 Reply ¶ 44.) Plaintiff further testified that Opromalla frequently looked her up and down and said things such as "You are looking very pretty today" and "You look skinnier. You are looking good" and that he would compliment her hair. (Pl. Tr. at 67:5-22; 73:2-7.) Plaintiff further testified that, on one occasion, Opromalla said "Wow. Look at you. We have got a nice pretty Spanish model here." (*Id.* at 73:2-7.)

In addition to the above comments, Plaintiff testified that at some point during her first six months at the Academy, Opromalla leaned in very close to Plaintiff (with his face about eight inches away from her ear) and whispered "I can give you private lessons outside. I know you are having trouble. I want you to be a cop. If you don't say anything to anyone." (*Id.* at 72:9-23; *see also id.* at 73:22-25.) Based on Opromalla's body language and the fact that probationary officers are told that they cannot fraternize with instructors, Plaintiff interpreted Opromalla's invitation as a sexual overture. (City 56.1 Reply ¶ 39.) It is not clear from the record what, if anything, Plaintiff said in response, but she evidently did not accept Opromalla's invitation. There is no indication that Opromalla took any action against Plaintiff following her refusal. Further, it is undisputed that Opromalla had no role in the decision to terminate Plaintiff. (City 56.1 Resp. ¶¶ 36-37.)

Finally, Plaintiff testified that on January 29, 2015, following her meeting with Dr. Henry at which he allegedly told her to resign, she went to speak with Wallace at the recommendation of Sgt. Vera. (Pl. Tr. at 106:16-24.) According to Plaintiff, after she explained to Wallace that Dr. Henry had told her to resign, Wallace told her: "You know, you are considered a bitch here. You know, you are a very attractive female. You are very pretty. You have a

strong personality, but people here know you as a bitch. You need to start playing this game if you want to get into a good precinct … Play the game and you will be fine." (City 56.1 Reply ¶¶ 228-229.) Plaintiff testified that she understood "playing the game" to mean: "You had better flirt. You had better bat your eyelashes. You had better humble yourself. You had better date, have sex, whatever it is, if you want to graduate and if you want to get into a good precinct. If you don't do that, you are going to get bullied. You are going to be bullied until you can't take it anymore." (*Id.* ¶ 231.) Plaintiff further testified that her interpretation was based on "the nature in general of everything that I experienced at the [A]cademy," (Pl. Tr. at 70:25-71:1), but admitted that Wallace did not explain what he meant, and Plaintiff does not appear to have asked him to elaborate (*Id.* at 70:11-12).

### D.   Alleged Age Discrimination

Plaintiff testified that she felt singled out during her time at the Academy because she was in her thirties, while her colleagues were, with two exceptions, in their twenties. (*E.g.* City 56.1 Reply ¶¶ 27-28.) Plaintiff testified that in her first few days at the Academy, unnamed individuals would ask probationary officers their age (or questions to which the answers would serve as a proxy for age) when introducing themselves. (Pl. Tr. at 62:21-24.) Plaintiff also testified that Sgt. Bernal told her that she was "way too old to be a police officer" and that "people in their twenties become cops, not in their thirties." (*Id.* at 61:23-25.) Plaintiff further testified that unnamed individuals referred to her as "Ms. Master's Degree," which she interpreted in part as a reference to her age. (*Id.* at 65:12-13.)

### E.   Alleged Race Discrimination

As noted above, Plaintiff testified that Opromalla once told her: "Wow. Look at you. We have got a nice pretty Spanish model here." (*Id.* at 73:2-7.) Plaintiff further testified that she was one of only two Hispanic probationary officers in her company. (*Id.* at

65:16-21.) As previously noted, however, approximately 40% of all NYPD recruits are Hispanic.

### F. Prior Litigation

On April 27, 2016, Plaintiff, proceeding *pro se*, commenced a civil action against the City in New York County Supreme Court bearing the caption *Glenda M. Mejia v. City of New York*. (*See* Compl., *Mejia v. City of New York* (Dkt. 77-15).) On August 26, 2016, Plaintiff (now represented by counsel) served an Amended Complaint asserting claims under Title VII, NYSHRL, and NYCHRL. (Am. Compl., *Mejia v. City of New York* (Dkt. 77-16).) The following February, Justice James E. D'Auguste granted the City's motion to dismiss the Amended Complaint under CPLR §§ 3211(a)(2) and (a)(7), holding that Plaintiff had failed to exhaust her administrative remedies as to her Title VII claims and that Plaintiff's "bare conclusory allegations" were insufficient to substantiate her remaining state- and city-law claims. *Mejia v. City of New York*, Ind. No. 100671/16, 2017 WL 563475 (N.Y. Cty. Sup. Ct. Feb. 8, 2017).

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). "A 'material' fact is one capable of influencing the case's outcome under governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." *Figueroa v. Mazza*, 825 F.3d 89, 98 (2d Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The movant may discharge its initial burden by demonstrating that the non-movant "has 'failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial.'" *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 255 F. Supp. 3d 443, 451 (S.D.N.Y. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986)).

"To determine whether an issue is genuine, '[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion.'" *Mikhaylov v. Y & B Trans. Co.*, No. 15-CV-7109 (DLI), 2019 WL 1492907, at *3 (E.D.N.Y. Mar. 31, 2019). While the court must draw all inferences in favor of the non-movant, the non-movant "may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995). Finally, in considering Defendant's motion, the court is mindful that the Second Circuit "has long recognized 'the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent.'" *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 74 (2d Cir. 2016) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)). Nevertheless, "[t]hough caution must be exercised in granting summary judgment where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 40 (2d Cir. 1994).

## III. DISCUSSION

Plaintiff advances claims under numerous statutes and theories of discrimination. Because Plaintiff's claims involve multiple alleged violations of each statute, the court addresses Plaintiff's claims by theory of discrimination, as opposed to by statute. As discussed in greater detail herein, the court concludes that Plaintiff's claims are not barred by the state-court dismissal, but grants

summary judgment to Defendants on all claims except for Plaintiff's hostile work environment claim under NYCHRL as against Opromalla and Wallace, over which the court will retain jurisdiction.

Separately, while the court grants summary judgment to all Defendants on nearly all of Plaintiff's claims, the court separately notes that there is simply no evidence in the record to support a colorable claim against the PBA, which had no involvement in the underlying events, and independently grants summary judgment to the PBA on all claims for this reason, as well as for the reasons discussed herein.

### A. Preclusion

Prior to engaging with the merits of Plaintiff's claims, the court must first address the issues of claim preclusion and issue preclusion, which all Defendants contend operate to bar Plaintiff's claims.

Claim preclusion and issue preclusion are related doctrines that operate, under certain circumstances, to prevent a party from litigating claims or issues that either were or could have been litigated in a prior action. *See, e.g., Ostreicher v. Lincoln Nat'l Life Ins. Co.*, No. 17-cv-6904 (NGG), 2019 WL 7194478, at *4 (E.D.N.Y. Dec. 26, 2019). An essential pre-requisite to the invocation of either claim or issue preclusion is the existence of prior litigation between the parties or their privies that concluded in a "final judgment on the merits." *Id.* Where, as here, the prior litigation was in state court, a federal court must accord the judgment terminating the prior litigation the same preclusive effect as would the courts of the rendering state. *See Cloverleaf Realty of N.Y., Inc. v. Town of Wawayanda*, 572 F.3d 93, 95 (2d Cir. 2009) ("Federal courts must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the state in which the judgment was rendered.").

There is no dispute that Plaintiff previously instituted a lawsuit against the City in state court raising many of the same claims as she has raised here, nor do the parties dispute the fact that the prior case was terminated in the City's favor when the court granted its motion to dismiss the relevant claims for failure to state a claim under CPLR § 3211(a)(7).[10] The sole point of contention is whether, under New York law, that dismissal was "on the merits" such that Plaintiff may not pursue them in this court.

Under New York law, a dismissal for failure to state a claim under CPLR § 3211(7) is presumptively not a decision on the merits unless the court so states. *See, e.g.*, *Shahid v. Legal Aid Society*, 100 N.Y.S.3d 874, 875 (2d Dep't 2019) ("As a general rule, a dismissal for failure to state a cause of action is not on the merits and, thus, will not be given res judicata effect."); *see also DDR Const. Servs., Inc. v. Siemens Indus., Inc.*, 770 F. Supp. 2d 627, 647 (S.D.N.Y. 2011) ("[A] Rule 3211(a)(7) is only on a case['s] merits if the rendering court explicitly says so."). Absent an affirmative indication that a § 3211(a)(7) dismissal constitutes a decision on the merits, that dismissal precludes, at most, relitigation of the sole issue decided, *i.e.* whether the dismissed complaint states a cause of action under the applicable pleading standards. *See, e.g.*, *Blake v. City of New York*, 41 N.Y.S.3d 755, 757 (2d Dep't 2016).

In this case, nothing in Justice D'Auguste's dismissal order suggests that the decision was "on the merits." Justice D'Auguste did not state that the decision was on the merits, that the dismissal was with prejudice, or that Plaintiff could not conceivably allege a set of facts that would support her claims. Instead, Justice D'Au-

---

[10] As noted above, Plaintiff asserted Title VII claims in that proceeding that were dismissed due to Plaintiff's failure to exhaust her administrative remedies. Because Plaintiff has not re-asserted those claims in this proceeding, the court need not discuss whether that dismissal has any preclusive effect.

guste held that the allegations of the amended state-court complaint were facially insufficient to support the claims asserted. *See generally Mejia v. City of New York*, Ind. No. 100671/16, 2017 WL 563475 (N.Y. Cty. Sup. Ct. Feb. 8, 2017). Accordingly, that decision has no preclusive effect.

Defendants also argue that, even if the earlier dismissal was not a "final judgment", dismissal on preclusion grounds is nonetheless appropriate because Plaintiff's complaint in this action "fails to correct the defect or supply the omission determined to exist in the earlier complaint." *Blake*, 41 N.Y.S.3d at 757. The court, however, does not believe it to be an efficient use of judicial resources to determine whether a complaint should be dismissed (presumably with leave to amend) for mere pleading defects in a case that the parties have already litigated through the close of discovery. *Cf. Rios-Campbell v. U.S. Dep't of Commerce*, 927 F.3d 21, 26 (1st Cir. 2019) ("Absent special circumstances … we see no justification for allowing a district court to travel back in time and train the lens of its inquiry on the bare allegations of the complaint while disregarding the compiled factual record."); *Grajales v. Puerto Rico Ports Auth.*, 682 F.3d 40, 46 (1st Cir. 2012) ("[O]nce the parties have invested substantial resources in discovery, a district court should hesitate to entertain a Rule 12(c) motion."). Accordingly, to the extent Defendants seek judgment on the pleadings, the court, in its discretion, declines to consider such arguments and instead assesses the claims on their merits.

### B.  Disability Discrimination

Plaintiff asserts claims for disability discrimination under 42 U.S.C. § 1983 and NYSHRL.[11] At the outset, the court notes that

---

[11] In her opposition to the instant motion, Plaintiff argues that the evidence establishes a disability discrimination claim under NYCHRL as well. However, Plaintiff's complaint unequivocally does not plead such a claim, as

§ 1983 generally does not provide a cause of action for disability discrimination. *See, e.g.*, *Lener v. Hempstead Public Schools*, 55 F. Supp. 3d 267, 281 (E.D.N.Y. 2014) (collecting cases). Further, Plaintiff does not address her § 1983 disability discrimination claim in her opposition to this motion; as such, even if such a cause of action does exist, Plaintiff has abandoned it. *See Scott*, 2020 WL 208915, at *10. Accordingly, the court grants summary judgment on Plaintiff's § 1983 claim insofar as it is premised on disability discrimination.

As against the remaining defendants, Plaintiff's NYSHRL claim is evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Mathew v. North Shore-Long Island Jewish Health Sys., Inc.*, 582 F. App'x 70, 71 (2d Cir. 2014) (summary order). Under the *McDonnell Douglas* framework, Plaintiff bears the initial burden of establishing a prima facie case of discrimination. Plaintiff's discharge of this burden creates a rebuttable presumption that Defendants' actions were motivated by discriminatory animus, and the burden shifts to Defendants to demonstrate a legitimate non-discriminatory reason for their actions. *See, e.g.*, *Benzinger v. Lukoil Pan Am., LLC*, __ F. Supp. 3d __, 2020 WL 1322478, at *10 (S.D.N.Y. 2020). If Defendants discharge their burden, the presumption of discriminatory animus fades away and the burden shifts back to Plaintiff to establish that the proffered reason is pretextual. *See id.; see also, e.g.*, *King v. Block Institute, Inc.*, No. 17-cv-7318 (NGG), 2020 WL 2523245, at *6 (E.D.N.Y. May 18,

---

the causes of action under NYCHRL are premised on "gender discrimination, race discrimination, and hostile work environment." (Compl. ¶ 105.) As Plaintiff failed to assert such a claim in her complaint, she cannot do so now. *See, e.g.*, *Brandon v. City of New York*, 705 F. Supp. 2d 261, 278 (S.D.N.Y. 2010) ("It is black letter law that a party may not raise new claims for the first time in opposition to summary judgment." (collecting cases)).

2020). Proof of pretext does not require proof that the Defendants' proffered reason was false or immaterial to the employment decision; it is sufficient to show that the decision was at least partially motivated by discriminatory animus. *See, e.g.*, *Benzinger*, 2020 WL 1322478, at *10.

To establish a prima facie claim for disability discrimination under NYSHRL, Plaintiff must prove that: (1) she is disabled within the meaning of NYSHRL, (2) she was competent to perform her job or was performing her duties satisfactorily, (3) she suffered an adverse employment action, and (4) the adverse action occurred under circumstances giving inference to a rise of discrimination. *See, e.g.*, *McDonnell v. Schindler Elevator Corp.*, No. 12-cv-4614 (VEC), 2014 WL 3512772, at *5 (S.D.N.Y. July 16, 2014). To satisfy the first prong, Plaintiff must prove that she suffers from a "physical … or medical impairment … which, upon the provision of reasonable accommodations, do[es] not prevent the [her] from performing in a reasonable manner the activities involved in the job or occupation sought or held." N.Y. Exec. Law § 292(21). Where a plaintiff's condition is such that she cannot perform the activities of her position with or without a reasonable accommodation, the employer is not prohibited from taking adverse action against her based on that condition. *See Jacobsen v. New York City Health & Hosp. Corp.*, 22 N.Y.3d 824, 834 (2014) ("Under the state HRL, if an employee has a physical impairment that prevents the employee from performing the core duties of his or her job even with a reasonable accommodation, the employee does not have a disability covered by the statute and, consequently, the employer is free to take adverse action against the employee based on that impairment.").

It is at this first step that Plaintiff's claim falters. Even drawing all inferences in her favor, the record establishes that Plaintiff was not physically capable of performing the physical tasks required

of NYPD officers, as it is undisputed that she was unable to complete the 1.5-mile run in the required period of time at any point during her tenure as a probationary officer. Moreover, nothing in the record suggests that her physical fitness had improved at the time that she was terminated and, as the City Defendants note, she paradoxically asserts that she was discriminated against by being "forced" to train in order to improve her physical condition. Plaintiff appears to argue that her medical conditions had resolved (or, at least, were asymptomatic) and that, given a reasonable accommodation in the form of more time (though the court notes that she was already given additional time relative to her entering class), she would have been able to complete the run. That assertion, however, amounts to mere speculation and is not sufficient to create a triable issue of fact in the face of the undisputed evidentiary record. *See, e.g.*, *Fletcher*, 68 F.3d at 1456 (speculation and conjecture insufficient to defeat motion for summary judgment).[12]

Even if Plaintiff had established a prima facie claim, Defendants have proffered a legitimate non-discriminatory reason for her termination: that her medical condition presented long-term risks that were incompatible with police service. Plaintiff argues that this conclusion conflicts with Dr. Cohen's determination that Plaintiff could resume normal activities on the same date she was

---

[12] Plaintiff also repeatedly emphasizes Dr. Henry's testimony that he believed that it was possible that she could make a full recovery if she had surgery. It is undisputed, however, that Plaintiff did not undergo surgery and she affirmatively testified that she was not interested in having surgery. (Pl. Tr. at 56:9-11 ("[Surgery] was not an option. I did not want to go to surgery. That is something very invasive.").) Further, to the extent that Plaintiff argues that the fact that Dr. Henry did not discuss the idea of surgery with her constitutes a failure to engage in a dialogue related to accommodations, that argument is meritless. Plaintiff has not provided any precedent to support the notion that NYSHRL requires that an employer suggest to an employee that she undergo an invasive medical procedure, and the court is not aware of any support for this proposition.

terminated. However, even assuming the contents of Dr. Cohen's February 2, 2015 letter to be admissible under Federal Rule of Evidence 803(4), it fails to demonstrate pretext. Nothing in Dr. Cohen's letter speaks to Plaintiff's long-term prognosis nor does it speak to whether Plaintiff would be able to perform the duties of a police officer without increased health risks; indeed, Dr. Cohen's letter is consistent with Dr. Henry's own observation that Plaintiff appeared to be asymptomatic when he recommended her termination. The isolated suggestions by other officers and Sergeants that Plaintiff should resign likewise fail to establish pretext; even viewed in the most favorable light to Plaintiff, the context in which they were made indicates that they arose out of concerns for her health and the potential ramifications of a termination being on her record.

Finally, to the extent that Plaintiff asserts a claim for failure to accommodate based on Dr. Galvin's refusal to provide her with an elevator pass, that claim fails because, *inter alia*, Plaintiff has not established that she would have been able to perform the duties of her job if she had been provided with an elevator pass. *See, e.g.*, *Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 73 (S.D.N.Y. 2016) (elements of prima facie claim under NYSHRL for failure to accommodate include establishing that "with reasonable accommodation, plaintiff could perform the essential functions of the job at issue").

## C.  Race, Age, & Sex Discrimination – Wrongful Termination

Plaintiff asserts claims for race discrimination under 42 U.S.C. §§ 1981 and 1983, NYSHRL, and NYCHRL; for sex discrimination under 42 U.S.C. § 1983, NYSHRL, and NYCHRL; and for age discrimination under 42 U.S.C. § 1983 and NYSHRL, all in reference to her termination. Each of these claims is evaluated under the *McDonnell Douglas* framework. *See Littlejohn v. City of New*

*York*, 795 F.3d 297, 307 (2d Cir. 2015); *McGill v. Univ. of Rochester*, 600 F. App'x 789, 790 (2d Cir. 2015) (summary order); *Missick v. City of New York*, 707 F. Supp. 2d 336, 347 (E.D.N.Y. 2010); *Tappe v. Alliance Capital Mgmt., L.P.*, 198 F. Supp. 2d 368, 372 (S.D.N.Y. 2001). However, "courts must analyze NYCHRL claims separately and independently from any federal and state law claims … construing the NYCHRL's provisions broadly … to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).

To establish a prima facie case under any of these statutes, including the NYCHRL, Plaintiff must prove that: (1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) the circumstances surrounding that action give rise to an inference of discrimination. *See, e.g.*, *Missick*, 707 F. Supp. 2d at 347. The burden required to establish an inference of discrimination is minimal; "it is enough that the plaintiff experiences an adverse employment action while others outside her protected class do not." *Id.* Other circumstantial evidence, such as invidious comments relating to a protected characteristic (whether aimed at Plaintiff or another in her protected class) may also suffice to establish an inference of discrimination. *See Littlejohn* 795 F.3d at 312.

Notwithstanding her minimal burden, Plaintiff cannot establish a prima facie case of discrimination under any of the relevant federal or state laws based on the undisputed factual record of this case. First, as discussed in the preceding section, there is no dispute that Plaintiff was unable to perform the physical duties of a police officer at the time of her termination and, as such, she is unable to prove that she was qualified for her position. *See Pena-Barrero v. City of New York*, 726 F. App'x 31, 34 (2d Cir.

2018) (summary order) (provisional city employee could not establish prima facie case where it was undisputed that he had failed his civil service exam and, as such, could not demonstrate that he was qualified for his position).

Even if Plaintiff were able to demonstrate that she was qualified for her position, Plaintiff cannot establish discriminatory animus on the basis of disparate treatment. Plaintiff does not dispute that men and women of all races were terminated in the same year that Plaintiff was terminated, including two white males terminated under the exact same code as Plaintiff. (City 56.1 Resp. ¶¶ 48-50.) Plaintiff likewise has not adduced evidence that the other members of her company or class who were in their thirties were also terminated.

Moreover, assuming Plaintiff could establish that she was qualified and the alleged discriminatory comments to which she claims to have been subjected were sufficient to establish a prima facie case, Defendants have proffered a legitimate, non-discriminatory reason for her termination, and Plaintiff has not adduced evidence that would permit a finding that such reason was pretextual. *See, e.g.*, *Eyuboglu v. Gravity Media, Inc.*, __ F. App'x __, 2020 WL 1280675, at *2 (2d Cir. 2020) (summary order); *see also Tubens v. Police Dep't of City of New York*, 48 F. Supp. 2d 412, 419-20 (S.D.N.Y. 1999) (granting summary judgment on Title VII wrongful-termination claim by probationary police officer where, although plaintiff claims to have heard "racist remarks," record indicated that reason for dismissal was NYPD physician's conclusion that plaintiff "could not perform the physical activities of a police officer" and plaintiff failed to adduce evidence of pretext). This is especially true given the absence of evidence that any of the individuals who made the comments had any role in the decision to terminate her and the absence of any close tem-

poral proximity between the alleged comments and Plaintiff's termination. *See Smith v. New York and Presbyterian Hospital*, __ F. Supp. 3d __, 2020 WL 777786, at *19-20 (S.D.N.Y. 2020).

Plaintiff's NYCHRL claim likewise fails. Although, as noted above, the NYCHRL must be construed broadly in favor of plaintiffs, it employs a similar causation standard to that of its federal and state counterparts such that a plaintiff must still "show that discrimination played a role in the employer's decision-making." *Smith v. City of New York*, 385 F. Supp. 3d 323, 342 (S.D.N.Y. 2019). As such, notwithstanding the more generous interpretation given to claims brought under NYCHRL, Plaintiff's failure to adduce evidence supporting an inference that her termination was motivated by discriminatory animus is fatal to her claim under this statute. *See id.*

Accordingly, the court grants summary judgment to Defendants on each of these claims.

### D. Municipal Liability

Plaintiff asserts claims under 42 U.S.C. § 1983 against the City under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Because Plaintiff has not established any primary violations of 42 U.S.C. § 1983, her *Monell* claims necessarily fail. *See Kanderskaya v. City of New York*, 590 F. App'x 112, 114 (2d Cir. 2015) (summary order).

### E. Retaliation

Plaintiff asserts claims for retaliation under 42 U.S.C. § 1981, NYSHRL, and NYCHRL. These claims are likewise evaluated under the *McDonnell Douglas* burden-shifting framework. *See, e.g.*, *Edwards v. Jericho Union Free Sch. Dist.*, 55 F. Supp. 3d 458, 467-70 (E.D.N.Y. 2014); *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 592 (S.D.N.Y. 2012). To establish a prima facie case of retaliation under § 1981 or NYSHRL, Plaintiff must prove: (1) that she engaged in protected activity, (2) that her

employer was aware of this activity, and (3) that her employer took adverse action against her as a result of the activity. *See, e.g.*, *Whyte v. Nassau Health Care Corp.*, 969 F. Supp. 2d 248, 259 (E.D.N.Y. 2013).[13] "A causal connection in retaliation claims can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment … or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019). The standard is similar under NYCHRL, except that under NYCHRL a plaintiff must only establish that the employer took action "reasonably likely to deter a person from engaging in protect[ed] activity." *Rozenfeld v. Dep't of Design & Const. of City of New York*, 875 F. Supp. 2d 189, 208 (E.D.N.Y. 2012).

On this record, Plaintiff cannot establish a prima facie case of retaliation. As an initial matter, much of Plaintiff's purported protected activity is unsupported by the record. For example, Plaintiff claims in her papers that she opposed the "forced" trainings that she participated in while recovering from her injury. (City Opp. at 29.) However, there is no testimony or other evidence in the record to support the characterization that such trainings were "forced," nor is there any evidence that she opposed such trainings. Plaintiff likewise asserts that she engaged in protected activity when she requested an elevator pass from Dr. Galvin. (*Id.*) However, "[u]nder both [NYSHRL] and [NYCHRL], a request for a reasonable accommodation is not a protected activity for purposes of a retaliation claim." *Witchard v. Montefiore Med. Center*, 960 N.Y.S.2d 402, 403-04

---

[13] Unlike NYSHRL and NYCHRL, only race-based retaliation claims are actionable under Section 1981. *See generally*, *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008); *see also* 42 U.S.C. § 1981. Because the defects in Plaintiff's retaliation claims do not depend on the theory of retaliation, the court analyzes this claim together with Plaintiff's NYSHRL and NYCHRL retaliation claims.

(1st Dep't 2013); *see also D'Amico v. City of New York*, 73 N.Y.S.3d 540, 541 (1st Dep't 2018).[14]

Plaintiff further contends that she engaged in protected activity when she declined Opromalla's invitation for private lessons. (City Opp. at 29.) Assuming that this constitutes protected activity,[15] Plaintiff still cannot establish a prima facie claim of retaliation because there is no evidence that she either made her supervisors aware of the advance or that any adverse employment action—or any action at all—was taken against her as a result of her rejection of that advance. Plaintiff did not testify that she reported Opromalla's invitation to HR or any other superior, nor did she testify that Opromalla took any action against her following her rejection of that advance. Further, although temporal proximity between engaging in protected activity and an adverse employment action can establish an inference of causation, Plaintiff testified that Opromalla's invitation was made at least six months before her

---

[14] The court notes that some courts in this circuit reject the proposition that requesting an accommodation is not a protected activity under NYCHRL on the basis that this constitutes protected activity under the Americans with Disabilities Act (though not under NYSHRL), and NYCHRL must be interpreted as equally or more protective of civil rights than its federal and state counterparts. *See Scorsonelli v. Madison Dentistry, P.C.*, No. 18-cv-4269 (JMF), 2019 WL 6032787, at *1 n.1 (S.D.N.Y. Nov. 14, 2019). While the court believes it appropriate to defer to the interpretation of the Appellate Division unless and until the Court of Appeals or Second Circuit concludes otherwise (particularly where, as here, the state and federal laws are not coextensive), it notes that the position of other district courts is not unpersuasive. However, even if the court were to adopt that position, Plaintiff's retaliation claim would still fail, as there is no evidence that any action reasonably likely to deter a person from requesting an accommodation was taken against her in response to her request.

[15] District courts remain split on whether declining sexual advances itself amounts to protected activity. *See Williams v. New York City Dep't of Ed.*, No. 19-cv-1353 (CM), 2019 WL 4393546, at *11 (S.D.N.Y. Aug. 28, 2019) (collecting cases).

termination, which is too temporally attenuated to permit such an inference. *See Block Institute*, 2020 WL 2523245, at *7 ("[D]istrict courts in this circuit have consistently held that the passage of two or three months between the protected activity and the adverse employment action does not allow for an inference of causation." (quoting *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (collecting cases))). Further, even assuming that Opromalla's invitation had occurred shortly before Plaintiff's termination, it is undisputed that Opromalla played no role in the decision to terminate Plaintiff which, as discussed in the preceding sections, was done for facially non-discriminatory reasons. As such, Plaintiff's retaliation claims necessarily fail.[16]

Accordingly, the court grants summary judgment on Plaintiff's retaliation claims.

### F.   *Quid Pro Quo* Sexual Harassment

Plaintiff asserts claims for *quid pro quo* sexual harassment under NYSHRL and NYCHRL.[17] "*Quid pro quo* sexual harassment occurs when submission to or rejection of improper or unwelcome

---

[16] The court has considered Plaintiff's NYCHRL claim separately and reaches the same conclusion. Notwithstanding the broader categories of conduct prohibited under NYCHRL, Plaintiff's failure to adduce evidence of any action being taken against her as a result of her engaging in protected activity necessarily defeats her NYCHRL claim.

[17] Plaintiff's complaint asserts broad claims for gender discrimination under 42 U.S.C. § 1983, which provides causes of action for *quid pro quo* sexual harassment and hostile work environment discrimination. *See Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006); *Richardson-Holness v. Alexander*, 196 F. Supp. 3d 364, 370 (E.D.N.Y. 2016). However, Plaintiff does not address these theories in her opposition and thus the court considers the claims abandoned. Were the court to consider them, it would grant summary judgment for the reasons set forth in this section and the following section.

sexual conduct by an individual is used as the basis for employment decisions affecting such individual." *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 311 (S.D.N.Y. 2016). As such, to succeed on her claim of *quid pro quo* sexual harassment, Plaintiff must adduce not only proof of a sexual demand by a supervisor, but also "that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands." *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 295 (S.D.N.Y. 2001) (quoting *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 57 (2d Cir. 2004)).

While the City Defendants contend that Opromalla's offer of "private lessons" was not an overt sexual overture (City Mem. at 13), drawing all inferences in Plaintiff's favor, the court concludes that a jury could plausibly conclude that it was so intended. Notwithstanding, as discussed in the preceding section with regard to Plaintiff's retaliation claims, Plaintiff has failed to adduce evidence that any action was taken against her following her rejection of that overture. Therefore, she is unable as a matter of law to sustain a claim either under NYSHRL or the more protective NYCHRL. As such, the court grants summary judgment to Defendants on these claims.

### G. Hostile Work Environment

Plaintiff likewise asserts claims for hostile work environment under NYSHRL and NYCHRL. The court analyzes these claims separately.

#### 1. NYSHRL

The elements of a hostile work environment claim under NYSHRL are identical to those for claims asserted under Title VII and 42 U.S.C. § 1983. *See, e.g.*, *Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 449 (E.D.N.Y. 2013). As such, to establish her hostile work environment claim, Plaintiff must prove that she was subject to conduct that: (1) was objectively

severe or pervasive to the point of creating an environment that a reasonable person would find hostile or abusive, (2) created an environment she subjectively perceived as hostile or abusive, and (3) created that environment on account of a protected characteristic. *See Robinson v. Harvard Prot. Servs.*, 495 F. App'x 140, 141 (2d Cir. 2012) (summary order). "To withstand summary judgment [on her claim], Plaintiff must produce evidence that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult, that the terms of her employment were thereby altered." *Russo*, 927 F. Supp. 2d at 446. In assessing whether challenged conduct rises to this level, courts "look to the record as a whole" and "consider[] a variety of factors, including the frequency of the discriminatory conduct; its severity; whether its physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Demoret*, 451 F.3d at 149. "Isolated incidents generally cannot sustain a hostile work environment claim unless they are extraordinarily severe." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010). As such, "simple teasing [and] offhand comments" are generally insufficient to sustain a hostile work environment claim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

It is unclear whether Plaintiff's NYSHRL hostile work environment claim is premised on gender discrimination alone or gender, age, race, and disability discrimination. Notwithstanding, the evidentiary record does not support a claim under any theory. As to non-sex-based discrimination, Plaintiff alleges only a single comment made that could be interpreted as referencing her race, one instance in which Bernal told her that she was "too old" to be a cop and that "people in their twenties become cops," and unspecified instances in which she was ridiculed by unnamed individuals for limping due to her injuries, which, though offensive, are plainly insufficient to establish the level of severity or pervasiveness required to prevail on a hostile work environment claim.

*See, e.g.*, *Robinson v. Dibble*, 613 F. App'x 9, 13 (2d Cir. 2015) (summary order) (affirming grant of summary judgment where evidentiary record established only that plaintiff had been subject to "crude and offensive comments directed at her gender or mental health issues that were delivered sporadically by coworkers").

The evidence is likewise insufficient to establish Plaintiff's sex discrimination hostile work environment claim. While the record indicates that Plaintiff was subject to more frequent comments that might be construed as discriminatory on this basis as compared to race, disability, or age (such as compliments on her physical appearance and being told that she was viewed as a "bitch"), and, on one occasion, subjected to an unwanted sexual overture, these incidents nonetheless fail to establish an environment "so permeated with discriminatory intimidation, ridicule, and insult," *Russo*, 927 F. Supp. 2d at 449, as to sustain a hostile work environment claim under NYSHRL. *See, e.g.*, *Sardina v. United Parcel Serv., Inc.*, 254 F. App'x 108, 110 (2d Cir. 2007) (summary order) ("[A] few off-color comments including references to 'office bitches' and 'Brooklyn bimbettes' … do not rise to the level of an objectively hostile work environment."); *Matthews v. Corning, Inc.*, 77 F. Supp. 3d 275, 293 (W.D.N.Y. 2014) (harassing conduct by colleagues, including one who referred to plaintiff as "cleaning bitch" not sufficiently severe or pervasive to support hostile work environment claim); *Spina v. Our Lady of Mercy Med. Center*, No. 97-cv-4661 (RCC), 2003 WL 22434143, at *3-4 (S.D.N.Y. Oct. 23, 2003) (evidence that plaintiff's supervisor called her a "bitch" and complimented her appearance, including telling her that she "looked good in tight pants" insufficient to support hostile work environment claim), *aff'd*, 120 F. App'x 408 (2d Cir. 2005) (summary order).

Accordingly, the court grants summary judgment on Plaintiff's NYSHRL hostile work environment claims.

2.  NYCHRL

Consistent with its broad remedial purpose, the standard for hostile work environment claims under NYCHRL is considerably less stringent than under NYSHRL and federal law. Under NYCHRL, there is no requirement that conduct be severe or pervasive before a hostile work environment claim may be sustained and "even a single comment may be actionable in appropriate circumstances." *Gorokhovsky v. New York City Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014) (summary order). As such, at summary judgment on an NYCHRL claim, the court must determine only whether "there is a triable issue of fact as to whether the plaintiff has been treated less well than other employees because of" her membership in a protected class. *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 671 (S.D.N.Y. 2012). "With that said, the NYCHRL, like Title VII and the NYSHRL, is still not a general civility code, and petty slights and trivial inconveniences are not actionable." *Id.*

Insofar as Plaintiff purports to assert a claim for race-based hostile work environment under NYCHRL, the single vaguely racial comment adduced in discovery is plainly insufficient to support such a claim, even under the extremely relaxed standard of that law.

Plaintiff's gender-based hostile work environment claim, however, is viable as against Opromalla and Wallace.[18] On this record, a jury could find that Opromalla's frequent alleged compliments of Plaintiff's appearance and his offer of private lessons (which, as previously noted, could plausibly be interpreted as a sexual overture), coupled with Wallace's statement to Plaintiff that people view her as "a bitch" were directly motivated by

---

[18] NYCHRL, by its terms, permits claims against individuals "regardless of ownership or decisionmaking power." *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 366 (S.D.N.Y. 2012).

Plaintiff's gender and therefore sufficient to make out a hostile work environment claim under NYCHRL. The City Defendants argue that this conduct amounts to no more than "petty slights and trivial inconveniences"; that may be true, but on this record the court cannot so conclude as a matter of law.

Although this claim may proceed against Wallace and Opromalla, there is no basis to hold any of the remaining Defendants liable. NYCHRL holds employers strictly liable for discrimination where the employee who engaged in the proscribed conduct exercised managerial or supervisory authority over the plaintiff, the employer knew about and acquiesced in the conduct, or the employer should have known of the conduct and failed to exercise reasonable diligence to prevent it. N.Y.C. Admin. Code § 8-107(13)(b); *see also, e.g.*, *Johnson v. Landmark Hosp. LLC*, No. 14-cv-6839 (RRM), 2016 WL 843286, at *3 (E.D.N.Y. Mar. 1, 2016). While the term "managerial or supervisory authority," is not defined in NYCHRL, this concept is broadly understood in the context of employment discrimination claims to refer to an individual employee's authority "to take tangible employment actions against the victim, *i.e.* to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013); *see also Rivera v. United Parcel Serv., Inc.*, Ind. No. 303092/2008, 2015 WL 13345524, at *4 (Bronx Cty. Sup. Ct. Dec. 24, 2015) (instructing jury to consider "whether the individual had the authority to direct daily work activities, hire, fire, promote, transfer, or discipline the plaintiff" when deciding whether individual exercised "managerial or supervisory authority" within the meaning of NYCHRL).

Here, there is insufficient evidence to hold the NYPD liable under a theory of supervisory liability based on the actions of Opromalla

and Wallace. The record is devoid of evidence that either Opromalla or Wallace "exercised managerial of supervisory authority" over Plaintiff. Plaintiff met with Wallace in his capacity as an HR counselor and union delegate and there is no indication that he played any other role with respect to Plaintiff over the course of her tenure as a probationary officer.[19] Opromalla, insofar as he was Plaintiff's gym instructor, presents a closer call. However, notwithstanding his title, the record indicates that instructors comprise a rotating group of officers whose role consists of, for example, leading workouts and providing suggestions to recruits who may be struggling, and that all matters that might affect a recruit's status are handled by the "supervisory cadre," which comprises sergeants and lieutenants. (*See* Tr. of Apr. 12, 2018 Dep. of M. Opromalla (Dkt. 84-10) at, *e.g.*, 14:5-16:6; 31:19-32:24; 37:6-39:17; *see also* Tr. of Apr. 27, 2018 Dep. of P. Bernal (Dkt. 84-12) at 51:3-52:4 (testifying that recruit evaluations are filled out by sergeants).) As such, on this record, there is no basis to conclude that Opromalla exercised managerial or supervisory authority over Plaintiff so as to permit the imputation of liability for Plaintiff's NYCHRL hostile work environment claim to the City or the NYPD.

Likewise, there is no evidence on the record to indicate that the City knew or should have known of the offensive comments that underlie this claim. Plaintiff testified that Opromalla's overture and Wallace's comment were made while she was alone with each man (Pl. Tr. at 73:14-21), and there is no evidence that she reported either of these conversations (or Opromalla's other comments) to anyone nor did she avail herself of the formal complaint process in place at the NYPD. *See Alvarado v. Jeffrey, Inc.*, 149 F. Supp. 3d 486, 501 (S.D.N.Y. 2016) (holding that, even if

---

[19] Assuming that Wallace was "employed" by the PBA within the meaning of NYCHRL, there is likewise no basis to hold that organization liable for the same reason.

statement were actionable, liability could not be imputed to employer where plaintiff "present[ed] no evidence that any manager … even knew that" statement had been made), *vac'd in part on other grounds sub nom.*, *Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4 (2d Cir. 2017) (summary order).

Plaintiff also asserts that the remaining Defendants can be held liable under the aiding and abetting provision of NYCHRL. *See* N.Y.C. Admin. Code § 8-107(6) (making it unlawful "[f]or any person to aid, abet, incite, compel, or coerce" violations of NYCHRL). However, aiding-and-abetting liability exists only where the individual "actually participates in the conduct giving rise to the claim." *Motta v. Glob. Contract Servs., Inc.*, No. 15-cv-8555 (LGS), 2016 WL 1611489, at *2 (S.D.N.Y. Apr. 21, 2016). There is no evidence in the record, however, to suggest that any Defendant other than Opromalla and Wallace participated in any of the conduct underlying Plaintiff's claim.

Accordingly, the court denies summary judgment on Plaintiff's NYCHRL claim as asserted against Opromalla and Wallace and grants it to the remaining Defendants.

### H.  Remaining Claims

Plaintiff asserts claims for deprivation of due process under 42 U.S.C. § 1983 in relation to her termination and for interference with protected rights in violation of NYCHRL. Plaintiff did not, however, address these claims in her opposition to the instant motion. Accordingly, the court deems these claims abandoned and grants summary judgment to Defendants. *See Scott*, 2020 WL 208915, at *10.

### IV.  SUPPLEMENTAL JURISDICTION

Having dismissed all of Plaintiff's federal causes of action, the court must determine whether to retain jurisdiction over her surviving city-law claim. When a district court dismisses all claims

over which it had original jurisdiction, it may still, in its discretion, exercise supplemental jurisdiction over state- and local-law claims for which there otherwise would be no jurisdictional basis. *See Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996); *see also* 28 U.S.C. § 1367. In determining whether to retain jurisdiction, district courts are instructed to consider judicial economy, convenience, fairness, and comity, and whether the remaining claims present novel issues of law best resolved by state courts in the first instance. *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 55-56 (2d Cir. 2004).

In this case, these factors weigh in favor of the court retaining jurisdiction. Plaintiff's NYCHRL claim presents no novel issue of law and given the significant resources already expended by the parties in litigating this case through the close of discovery, economy, convenience, fairness, and comity all weigh in favor of retention of jurisdiction. *See Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) ("If … the dismissal of the federal claim occurs late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair. Nor is by any means necessary."). Accordingly, the court will retain jurisdiction over Plaintiff's remaining NYCHRL claim.

## V.   CONCLUSION

For the foregoing reasons, Defendants' (Dkts. 75, 77) Motions for Summary Judgment are GRANTED IN PART and DENIED IN PART. The court grants summary judgment on all of Plaintiff's claims except for her hostile work environment sex discrimination claim under the New York City Human Rights Law as asserted against Defendants Officer Michael Opromalla and Officer Steven Wallace. The Clerk of Court is respectfully DIRECTED to terminate Defendants the City of New York, the New York City Police Department, the Patrolman's Benevolent Association of

the City of New York, William Joseph Bratton, Carol Ann Roberson, and Sergeant Paul Bernal from the case and amend the caption accordingly.

The remaining parties are DIRECTED to contact the chambers of Magistrate Judge James Orenstein concerning the next steps in this case.

SO ORDERED.


Dated:      Brooklyn, New York
            May 30, 2020


                                    /s/ Nicholas G. Garaufis  
                                   NICHOLAS G. GARAUFIS
                                   United States District Judge